2001 WY 53

**Donnie Ray LARA, Sr., Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 00–232.

Supreme Court of Wyoming.

June 13, 2001.

Carol Seeger of Carter Law Office, Gillette, WY, Representing Appellant.

Gay Woodhouse, Wyoming Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Paul S. Rehurek,

Deputy Attorney General, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, and KITE, JJ.

HILL, Justice.

[¶ 1] Appellant, Donnie Ray Lara Sr. (Lara), seeks review of the judgment and sentence of the district court which found him guilty of one count of delivery of methamphetamine and one count of conspiracy to deliver methamphetamine. The district court sentenced Lara to two concurrent sentences of four to ten years for those crimes. Although Lara originally entered a plea of not guilty, he later decided to change his plea to guilty conditioned upon leave to appeal the district court's determination that his confessions to those crimes were not coerced.

[¶ 2] We will affirm.

## ISSUE

[¶ 3] The sole issue raised in this appeal is whether the district court erred in denying Lara's motion to suppress his confessions. Lara contends that his confessions were not voluntary but, on the contrary, were coerced because the police officers that questioned him indicated that if he cooperated with them, then custody of his four children would be returned to him. The police denied that any such coercive tactic was used. Lara's children were placed in the temporary custody of the Department of Family Services (DFS) in the late night hours of Thursday–Friday, November 11–12, 1999. Lara's woman friend and the mother of his children, Michele Henderson (Henderson), was arrested during that time on charges relating to possession of methamphetamine, and there was no other responsible adult in the household to care for the children. As we shall set out in more detail below, the police officers involved testified that they did no more than inform Lara that his children were in the custody of DFS so that he would know where they were and attempted to inform him of the procedure to follow to locate them and inquire about the custody arrangements.

## FACTS

[¶ 4] At about 8:00 p.m., on November 11, 1999, the Gillette Police Department was called upon to investigate a report of child abuse that is unrelated to this case. However, in the course of conducting that investigation, the police seized methamphetamine from a female suspect, and that suspect reported that Henderson had delivered the methamphetamine to the suspect at Henderson's home. The police officers then obtained a warrant to search the house that Henderson and Lara shared. Methamphetamine was found in the residence, although neither Henderson nor Lara were present when the search warrant was executed. Henderson later confessed to her role in possessing, delivering, and conspiring to deliver methamphetamine, and she was arrested. The only adult present at the Henderson–Lara residence was Steve Newport. He was in possession of a syringe, which contained methamphetamine, and he appeared to be high on methamphetamine. For these reasons, DFS was contacted for the purpose of providing shelter care for the children [1]. Over the next 12 hours the police interviewed Lara on three occasions, and on each of those occasions Lara provided police with information that incriminated him in the activities for which he was ultimately convicted.

[¶ 5] The first such contact went as follows: Because Lara was not at home, the police began looking for him, and they actually ended up finding him driving to his residence. The police pulled him over just a half-block from his home. At about 1:00 a.m., on Friday, November 12, 1999, Forest "Frosty" Williams (Williams), a special agent for the Wyoming Division of Criminal Investigation (DCI), and Kevin McGrath, a Gillette police officer working with DCI, stopped Lara and asked him if he was willing to talk about what had happened that night. The

---

1. The governing statutes required shelter care for the children under the circumstances presented by this case (and Lara does not challenge those underlying factual circumstances). In addition, the police were required by those statutes to inform the children's parents as soon as possible that the children were in shelter care. Wyo. Stat. Ann. §§ 14-3-405 and 406 (LEXIS 1999).

officers intended to talk with Lara about his and Henderson's involvement in selling methamphetamine. They also wanted to inform Lara what had occurred at his home (that Henderson had been arrested and his children placed in shelter care). During that talk, as well as the succeeding interviews, Lara admitted to delivering methamphetamine to Ronald Wheelhouse and conspiring with Jason Cioffi to deliver methamphetamine. Both Williams and McGrath knew Lara from contacts they had with him in the past. Lara referred to the two police officers in the familiar names "Frosty" and "Kevin." With respect to this incident, Lara said that McGrath told him he could get his children back on the following Monday if he would cooperate with the police. Lara was not arrested during this encounter. The interview with Lara was not tape-recorded by the police.

[¶ 6] The second contact occurred only a few minutes later inside Lara's home. Williams left the scene of the first meeting with Lara and proceeded to follow-up on another aspect of the investigation into these crimes. McGrath rode with Lara (in Lara's pickup) the half-block to his home and followed him inside. Once inside, McGrath initiated a second interview with Lara. McGrath again told Lara about the children being placed in shelter care and that if he cooperated and was truthful, they would talk to the prosecutor on his behalf. McGrath made clear that no threats or promises were made concerning the children. Lara testified that McGrath told him he could get his children back on the following Monday if he cooperated with the police. Lara claimed he thought he was under arrest and that the police were going to take his children away from him. Lara also said that he understood McGrath to say that if he cooperated, then his children would be returned to him later that same day. Lara said he would not have cooperated if the police had not brought up the subject of his children. Lara was not arrested that night. These discussions likewise were not tape-recorded.

[¶ 7] The third contact occurred at about 1:00 p.m., on November 12, 1999, at the Campbell County Courthouse. Williams and McGrath ran into Lara in a courthouse hallway. Lara was there to attend Henderson's arraignment. They asked to talk with Lara and he again agreed to talk. At that interview, Lara again asked about his children:

[Williams]: I re-explained to Mr. Lara again why we had taken his children. Again, I explained to him what the conditions were at the time we were at the residence. I explained to him that shortly after entering the residence I had made the call to DFS to take his children, and it was several hours later that Mr. Lara had shown up at the residence.

I explained to him that he would need to talk to Jim Schermetzler of the county attorney's office in order to find out the exact process and when the court hearing was going to be so he could get his children back.

. . . .

Towards the end of the interview I walked out of the room and I explained to Donnie Lara, the defendant, that I was going to go try to find Mr. Schermetzler so Schermetzler could answer the questions directly. However, Schermetzler was not in the office.

[¶ 8] Williams also testified that he did not threaten Lara, nor did he tell Lara that he could only regain custody of his children if he confessed to the crimes and cooperated with the police. This interview was not tape-recorded either. Lara testified that he was threatened at this interview with the loss of his children and that he was unable to find out from the police where his children were or how to regain custody. Lara was not arrested on November 12, 1999. In his testimony at the suppression hearing, Lara went on to say that he went to bed at home in the early morning hours on November 12, 1999, and woke up about 10:00 a.m. that same morning. He listened to the radio and then later attended Henderson's arraignment. Lara said that on November 12, 1999, he talked with his niece about how to get his children back. He also claimed he contacted two lawyers on November 12, 1999, about regaining custody of the children. Lara was arrested on Monday, November 15, 1999.

## STANDARD OF REVIEW

[¶ 9] A trial court's ruling on a defendant's motion to suppress a statement on the grounds that it was made involuntarily is reviewed *de novo*. In conducting such a review, we defer to the trial court's findings of fact unless those findings are clearly erroneous. This Court considers all the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. The Fifth and Fourteenth Amendments to the United States Constitution, and Wyoming Constitution Article 1, §§ 6 and 11, require that confessions be voluntary. A statement that is obtained by coercion is not trustworthy and may not be used at trial against the person who made it. A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial. A statement is considered to be voluntary if the defendant of his own free and deliberate choice, and not because of intimidation, coercion or deception, makes it. The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary. *Edwards v. State*, 973 P.2d 41, 48 (Wyo.1999).

## DISCUSSION

[¶ 10] We must examine the totality of the circumstances that existed when the statements were procured in order to determine the voluntary nature of those statements. *Edwards*, 973 P.2d at 48–49. We note at the outset that the district court did not find Lara's testimony credible. The district court characterized Lara's declarations in this way: "It seems that Mr. Lara's memory is convenient, and it also appears most likely that it's the product of cultivated retrospection and enlightened self-interest." In addition, the district court opined that even if all Lara had to say with respect to the alleged coercion was true, "... the fact that Mr. Lara may have thought that somehow his cooperation was linked to getting his kids back, that doesn't satisfy the test of coercion, and I don't find from the evidence that the children were used as a threat to get Mr. Lara to testify." As noted above, we defer to such findings made by the trial court.

[¶ 11] The first statement was obtained while Lara was in his vehicle near his home. He was not under arrest, he was familiar with the officers who talked with him, and the officers testified that the stop was made for the purpose of informing Lara as to what was going on in his home and that his children were in the custody of DFS. This interview lasted only a few minutes. The second interview took place in Lara's kitchen and he was not under arrest. That interview lasted about 30 minutes. The third interview occurred when the police coincidentally ran into Lara in the courthouse. Although that interview took place in the prosecutor's conference room, Lara was not under arrest. That interview also lasted about 30 minutes. Lara's only allegation of coercion arises from his subjective perception that if he cooperated/confessed, then his children would be returned to him. The district court resolved that evidentiary dispute in favor of the State. There is no indication that Lara's mental state was impaired, other than the natural anxiety a defendant might feel when methamphetamine is found in his home and he has been involved in the distribution of that drug, *i.e.*, that the jig was up. Lara was read his *Miranda* rights, and he was given the opportunity to speak with a lawyer if he chose. Indeed, on November 12, 1999, Lara enlisted the assistance of his niece, as well as consulting with two lawyers, in his efforts to determine the whereabouts of his children. Lara alleges no other coercive conduct on the part of the police nor does he allege that his will was overborne because of his physical condition, educational background, or employment status. It was clear that Lara was familiar with law enforcement in general and, specifically, with the police officers involved in questioning him. Where police informed a defendant that the custody of an infant (who the defendant was accused of physically abusing) would be affected by the defendant's cooperation with police, a reviewing court held that the defendant failed to show that this was deceptive or so fundamentally unfair as to deny him due process and that the conduct of the police did not render the confession involuntary. *People v. Cannady*,

243 A.D.2d 642, 663 N.Y.S.2d 244, 245 (1997)[2]. Applying the standard of review set out above, we conclude there was no error in the trial court's determination that Lara's statements/confessions were voluntary.

[¶ 12] Lara contends that the credibility of the police officers should be reviewed more closely here because none of the interviews was tape-recorded. The district court noted that the problems that came up in the suppression hearing, as well as in this appeal, could be avoided if tape recorders were used in interviews. The district court also noted that the county attorney's office repeatedly had been reminded that it would be a good idea to tape interviews:

> Instead, they want to do it some other way and they expose themselves in every case to the—to the allegations that—that something was left out or misinterpreted or incorrectly emphasized, and they have to end up explaining to me and to the jury why they don't do it. Their explanations don't make sense to me, but I don't—it's not my prerogative to tell them they have to do that.

[¶ 13] In this instance, it is probably quite reasonable that the initial roadside interview near Lara's home was not taped. However, we agree with the district court that tape-recorded interviews do leave far fewer loose ends to be tied up and in many, if not most, instances would be a well-advised protocol to follow. Lara cites no authority for the proposition that this renders the trial court's findings any the less convincing given the totality of the circumstances in this case. In our independent research we have found no such case law either[3]. However, the trial court's advice is sound, and we include it for the instructive purpose it may serve.

---

2. For instructive purposes, we note that the voluntariness of a confession may be undermined if coercion in the form of suggesting relatives will benefit from a confession is used. Caroll J. Miller, Annotation, *Voluntariness of confession as affected by police statements that suspect's relatives will benefit by the confession*, 51 A.L.R.4th 495, *see esp.* § 11 ("Removal of child or children from parental custody") (1987). Lara cites cases from this annotation, but all are readily

[¶ 14] The judgment on the guilty pleas and the sentence of the district court are affirmed.

distinguishable from the circumstances present in the instant case.

3. However, *see Baynor v. State*, 355 Md. 726, 736 A.2d 325, 331–32 (Md.1999), collecting cases to the effect that a majority of state courts have rejected a requirement that custodial interrogations be recorded for a confession to be considered voluntary.