2005 WY 2

**Michael S. WILKINS, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 03–127.**

Supreme Court of Wyoming.

Jan. 11, 2005.

Representing Appellant: Kenneth M. Koski, State Public Defender and Donna D. Domonkos, Appellate Counsel.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; and D. Michael Pauling, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ, and YOUNG, D.J.

HILL, Chief Justice.

[¶1]   On December 4, 2002, appellant, Michael S. Wilkins (Wilkins), entered a conditional plea of nolo contendere [1] to the crime of third degree sexual assault.[2]   In addition to the complaint from the victim of the crime, a very important piece of evidence against Wilkins was a confession he made after taking a polygraph test that indicated he was being untruthful in his answers. The "condition" of his nolo contendere plea was that he reserved the right to appeal the district court's conclusion that his confession was voluntary and, therefore, admissible in evidence at his trial.   Wilkins asserted that he agreed to talk with the police, and to take the polygraph exam, only because he was assured that he would receive probation as his punishment.   He also contended that when the police asked him to take the polygraph, they told him that if he were deceptive in

1. The judgment and sentence, the amended judgment and sentence, the second amended judgment and sentence, and the nunc pro tunc judgment and sentence, all recite that Wilkins entered a plea of guilty.   The arraignment proceedings at which Wilkins entered his change of plea (he initially pled not guilty) demonstrate that Wilkins entered a nolo contendere plea. See W.R.Cr.P. 11(a)(1)(A).   At the change of plea proceeding, the district court equated a plea of nolo contendere with a plea of guilty and asked that a factual basis be established for the plea.   It was decided that the district court would rely on the affidavit of probable cause and Wilkins's attorney agreed with that procedure, but also stated that her client "maintains his innocence."   In *Peitsmeyer v. State*, 2001 WY 38, ¶¶ 2–7, 21 P.3d 733 ¶¶ 2–7 (Wyo.2001), we held that a factual basis is not required for a nolo contendere plea, indeed, such a requirement tends to obliterate the distinction between a plea of guilty and a plea of nolo contendere. Moreover, in some circumstances a guilty plea may not properly be accepted by a trial court in the face of a protestation of innocence by the defendant, coupled with an inadequate factual basis.   *See Sanchez v. State*, 592 P.2d 1130, 1135–36 (Wyo.1979).

2. Wyo. Stat. Ann. § 6–2–304 (LexisNexis 2003) provides:

   **§ 6–2–304.   Sexual assault in the third degree.**

   **(a) An actor commits sexual assault in the third degree if, under circumstances not constituting sexual assault in the first or second degree:**

   **(i) The actor is at least four (4) years older than the victim and inflicts sexual intrusion on a victim under the age of sixteen (16) years;** or

   (ii) The actor is an adult and subjects a victim under the age of fourteen (14) years to sexual contact without inflicting sexual intrusion on the victim and without causing serious bodily injury to the victim;

   (iii) The actor subjects a victim to sexual contact under any of the circumstances of W.S. 6–2–302(a)(i) through (iv) or 6–2–303(a)(i) through (vi) without inflicting sexual intrusion on the victim and without causing serious bodily injury to the victim.   [Emphasis added.]

answering the questions, he would have to talk to them and tell them what really happened. After failing the polygraph exam, Wilkins told police officers that he did have sexual intercourse with the victim.[3] Wilkins reasserted his innocence after the confession, and said he made it only to "get it over with" and spare his family any more anguish. The only issue posed by Wilkins before the district court was whether his confession was involuntary because it was induced by the promise of probation.[4] In its decision letter, the district court addressed all of the concerns raised by the evidence presented at the suppression hearing, thus going beyond just the asserted promise of probation, and considering also the totality of the circumstances. In his brief, Wilkins also makes a broader argument than just the promise of probation. Because the district court considered all of the facts and circumstances developed at the suppression hearing, we too will address all of the arguments raised by Wilkins in this appeal. We will affirm.

## ISSUES

[¶ 2] Wilkins and the State agree that the sole issue is whether the trial court erred in denying Wilkins' motion to suppress the statements he made to law enforcement officers.

## FACTS

[¶ 3] The facts pertinent to this appeal were developed at a hearing on Wilkins' motion to suppress his confession. At the outset of the hearing, Wilkins asserted that the sole basis for the motion to suppress was a promise of probation made to him by police officers. Detective John Haukap of the Laramie County Sheriff's Office testified that on March 29, 2002, at Haukap's request, Wilkins

voluntarily came to the Sheriff's office along with his parents and his fiancé. At that point, no charges had as yet been filed against him. Haukap reviewed with Wilkins the complaints that had been made against him. Wilkins denied having committed any crimes. Haukap indicated that the complaints made against him were credible, and asked Wilkins to take a polygraph test. He also explained to Wilkins the range of punishments applicable to the alleged crimes "from prison time to probation." Haukap testified that he made no promises. The upshot of this initial meeting between Wilkins and Detective Haukap was that Wilkins eventually agreed to take a polygraph test that was administered on April 23, 2002. Haukap also related that after the polygraph test was over, Wilkins admitted to having sexual intercourse with the victim.

[¶ 4] Deputy Steve Reese of the Laramie County Sheriff's Office administered the polygraph exam. Prior to the test, Wilkins signed a waiver to this effect:

I have been cautioned by John Haukap who has identified himself as a Police Officer who has warned me as follows:

"I caution you that you have an absolute right to remain silent[;]

That anything you do say can and will be used in a court of law against you;

That you have the right to the advice of a lawyer before and the presence of a lawyer here with you during questioning; and

That if you cannot afford a lawyer, one will be furnished to you for free before any questioning, if you desire."

I hereby state that the above rights have been explained to me; that I fully understand such rights and further, that I knowingly waive such rights.

---

3. Wilkins was charged with two counts of third degree sexual assault involving two different victims (L and M). The crimes were not reported to the police until several months after they occurred. As a part of the plea bargain leading to his nolo contendere plea, the second count (involving M) was dismissed.

4. The sentence imposed on Wilkins was a term of seven to ten years in a state penal institution. From the outset, the sentence contemplated that

if Wilkins successfully completed the boot camp program, then the remainder of his prison sentence would be suspended and he would be placed on probation. On September 22, 2003, Wilkins filed a motion for sentence reduction. In recognition of his successful completion of boot camp, an order reducing Wilkins' sentence was entered on October 6, 2003. That order suspended the remainder of his prison sentence and placed him on four years of probation.

In view of the above, I do hereby consent, voluntarily, **without duress, coercion, threats, promises of reward or immunity** to be examined on a polygraph instrument (lie detector), a detection of deception technique. I understand that operation of this instrument involves the use of electronic apparatus for the recording of physiological and psychological responses. I have had the nature of this examination explained to me and do hereby consent both to the placing of the necessary apparatus upon my person and to the use of any electronic hearing or recording devices operated contemporaneously with this examination. I do hereby release and forever hold harmless the County of Laramie, its agents and employees from any liability flowing either from the operation of the devices or use of the results obtained therefrom. I further agree that the results of this examination may be made available to the proper authorities.

[¶ 5] Prior to the test, Deputy Reese informed Wilkins of all the questions he was to be asked, so as to ensure that he was able to understand all of them. The questions asked were all "Yes" or "No" questions. The same set of nine questions was asked in two sessions (called charts). The two sessions were separated with a brief rest interval. The questions were asked in a different order during the second session. Deputy Reese pointed out that it takes longer to explain the procedure and ensure the test subject understands the procedure, than it does to ask the two series of nine questions. Wilkins indicated that he understood the process and the questions he was to be asked. The test indicated that Wilkins had answered some of the questions deceptively. Deputy Reese continued:

I advised him that he didn't do very well on the polygraph. It was my opinion he wasn't being truthful about, in this case, having sex with [the victim].

At that point, I explained to him I wanted to know from him if he made a habit of having sex with juveniles, and at that

point, he stated no, he was not, and then we got into it, "Well, tell me the truth."

And he told me exactly what happened. Deputy Reese testified that he made no promises of "favor, benefit, leniency, no charges, probation; any of that stuff."

[¶ 6] Wilkins testified that Detective Haukap told him, as well as his parents and fiancé, that the most he could get for his crimes was "301 [5] or probation," and that he would not have agreed to the polygraph or made any statements had that promise not been made. He claimed to have been confused by the testing process. Wilkins also related he was told before he took the polygraph that, "if I passed it, that he'd excuse the charges against me, and if I failed it, I had to tell him what happened." Wilkins claimed that when this circumstance came to pass, he again asked what would happen to him if he confessed and that he was told he would get "probation or 301." He claimed he admitted to the crime, even though he hadn't done it, because he "was scared and I wanted it all to be over with because I thought all I was going to get was probation." The gist of Wilkins' argument is that the police officers mentioned probation to him on several occasions, leaving him with the impression that such would be his punishment, although Wilkins also conceded that the police officers did not promise him probation.

[¶ 7] Wilkins' mother testified that Detective Haukap promised her son probation if he cooperated. She also testified that Wilkins had a learning disability and that he froze up when taking tests. Defense counsel then informed the district court that she had two other witnesses, Wilkins' father and fiancé, who would testify pretty much as his mother had, though it would be cumulative. The district court appeared to agree that it would take note of the other two witnesses' testimony as well, although they did not testify.

[¶ 8] Wilkins met with police officers on two occasions. Portions of both of those sessions were tape-recorded. The tape recordings were not transcribed, but the district court listened to the tape recordings,

5. This refers to Wyo. Stat. Ann. § 7–13–301 (LexisNexis 2003) (placing person found guilty, but not convicted, on probation).

noting that they were difficult to understand because of the poor quality of the recording. The cassette tapes are a part of the record on appeal and we too have considered them in our resolution of this appeal.

## STANDARD OF REVIEW

[¶ 9] A trial court's ruling on a defendant's motion to suppress a statement on the grounds that it was made involuntarily is reviewed de novo. In conducting such a review, we defer to the trial court's findings of fact unless those findings are clearly erroneous. This Court considers all the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. The Fifth and Fourteenth Amendments to the United States Constitution, and Wyoming Constitution article 1, §§ 6 and 11, require that confessions be voluntary. A statement that is obtained by coercion is not trustworthy and may not be used at trial against the person who made it. A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial. A statement is considered to be voluntary if the defendant of his own free and deliberate choice, and not because of intimidation, coercion, or deception, makes it. The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary. We must examine the totality of the circumstances that existed when the statements were procured in order to determine the voluntary nature of those statements. *Lara v. State*, 2001 WY 53, ¶¶ 9–10, 25 P.3d 507, 510, ¶¶ 9–10 (citing *Edwards v. State*, 973 P.2d 41, 48 (Wyo. 1999)); *also see Hannon v. State*, 2004 WY 8, ¶¶ 50–59, 84 P.3d 320, ¶¶ 50–59, and *Simmers v. State*, 943 P.2d 1189, 1194–95 (Wyo.1997).

## DISCUSSION

[¶ 10] The district court issued a decision letter announcing its conclusion that it would not suppress Wilkins' confession:

Given that there is no dispute about the fact that the officers did discuss the possible consequences of a conviction for the offense, the difference between an informational statement of the possibilities and on the other hand an improper promise of probation could depend upon one's subjective interpretation of what was said, influenced no doubt, by what one wanted to hear. Recall may be influenced in the same way. The differences, though critical, may be quite subtle.

Having heard the testimony of the police officers, the defendant and his mother, the tape-recorded portions of the interviews, it is the finding of the Court that the alleged promises were not made. The conclusion that the confession was voluntary almost necessarily follows, though the circumstances must be viewed in their entirety. The finding requires some explanation because it implies the rejection of the testimony of the defendant and his mother.

Wilkins was interviewed by Haukap on March 29, 2001, and by Reese and Haukap on April 23, 2001. There is no record of the entirety of the conversations among the various participants on those dates, but there are tape recordings of portions of those conversations, more particularly the interviews of Wilkins. The March 29th interview of Wilkins by Haukap begins with Haukap's statement to Wilkins that he is not in custody and need make no statement. Wilkins acknowledged this information. Haukap described the charges made by the girls and Wilkins denied them. The recordings are of very poor quality and difficult to understand, but with effort one can make out their content. The March 29th interview of Wilkins by Haukap, toward the end, includes the following:

[215] DETECTIVE HAUKAP: Are you worried about what's gonna happen?

MICHAEL: Kinda.

HAUKAP: You have any questions about what could happen?

MICHAEL: Well, I just wanna know what would happen if you went to the full extent of the law on me.

HAUKAP: Well, at this point Dave and they have no say in it since it got reported to us. We will do our report and send it to [the] DA and they are the ones who are

gonna file the charges and decide what's appropriate and what's not.

I mean, I can state from information right now that you'll probably get charged with 3rd degree sexual assault; once through [M] and a couple of counts or a couple of times through [L]. So, like I said, could be nothing ever happened. That's why I want you to take the polygraph test.

The interview ended with Wilkins denying having sexual intercourse with [L] or fondling [M]. This interview, so as far as the tape reveals, did not include any promise express or implied by Haukap to Wilkins. But that is not conclusive because Wilkins alleges that Haukap's representation was made after the interview when the two of them returned to the room in which Wilkins' family [was] waiting.

The other tape is a recording of the interview of Wilkins after the polygraph result was given to him and after his confession, which included his detailed statement describing his commission of the offense charged. The tape reveals that he is quite cooperative. Wilkins is told toward the end of this interview that the detectives could not see the DA putting him in jail for this offense. Haukap: "And I don't ... I will doubt the DA ... you know I don't ... I don't see them putting you in jail for this." It must be emphasized, though, that this was after Wilkins made his confession.

The conversation on the tape indicates the detectives are speaking on the assumption that since Wilkins has confessed he intended to admit guilt in the legal proceedings. They do inform him that there could be charges arising out of the occurrence alleged by [M] concerning which Wilkins made no admissions. In view of the above, it must be said that the tapes give no conclusive evidence. If the alleged assurance was given Wilkins it is not included on these tapes. However, as previously stated, there were portions of the conversation not recorded. This leaves one to rely on the other available evidence, including the testimony at the hearing on the motion.

Wilkins' own testimony at the hearing is that on three occasions he was assured by the police officers that probation would be the worst that could befall him. That his testimony is self-serving is obvious, but it does not necessarily mean that it should be rejected. Rather, it should be weighed with the other evidence. What damages Wilkins' credibility is that one way or the other he was untruthful. That is, he first vehemently denied any sexual contact with [L], then admitted it, then did another about-face and now denies it. He testified that he falsely told the officers that he did it only because his family was very upset about it and he thought that since he would get only probation anyway he may as well admit it and get it all over with. Wilkins thus testified under oath that if it suited his purpose at the moment he would be untruthful. In view of the several changes in Wilkins's position, it is difficult to ascribe much credibility to his testimony. That testimony was, however, corroborated by that of Mr. Wilkins' mother.

Taken all together, Mrs. Wilkins' testimony simply is not convincing. It is clear that she, as most mothers one supposes naturally would, finds it hard to believe that her son would commit such an offense. That it occurred within the family probably makes it even harder to accept. But Mrs. Wilkins' testimony reveals her mindset that there is no way she would believe that her son committed the offense and is convinced that if he confessed to it he was duped. She equates what she refers to as Wilkins' "anxiety" about taking tests with his not doing well in the polygraph examination. Drawing such a parallel between testing in the academic sense and a "lie detector test" is a stretch. Wilkins is 22 years old, at the time of the hearing he was married and living apart from his own family, although with his wife's parents. He received a high school diploma. His own testimony indicates more a capacity to manipulate that susceptibility to manipulation.

Just as the testimony of the accused may not be rejected on the basis alone that it is his testimony, so the testimony of police officers may not [be] accepted solely

because it is the testimony of police officers. However, the two officers who testified, Haukap and Reese, are police officers of substantial experience. Had they made the statements attributed to them by Wilkins it would have been wrong in several respects other than the improper inducement of the confession. First, of course, it would have been an untrue statement. These officers know full well that there can be no guarantee of probation on any felony offense. There are simply far too many variables. In addition, they are without authority to make any such representation. To have made the representations attributed to them the officers would have had to ignore their ethical obligations. Nothing in their testimony indicated that they were not being truthful.

Also of significance is that Wilkins' denial persisted through the alleged assurances. It was only after he was given the results of the polygraph that he confessed. If the inducement for his statement were the promise, one would expect it at that time, rather than considerably later.

All of the above must be seen in the light of the factor mentioned early on. That is, there would need be only a slight difference in phraseology between an assurance of probation and information that probation was a possibility along with others. It would not be at all surprising for Mr. Wilkins, his parents and fiancé to have heard or interpreted what was said to mean what they would prefer was said. The hearing was several months after the incidents described in the testimony.

Other aspects of the voluntariness issue are not seriously in dispute. It is plain in the record that Wilkins was not undergoing custodial interrogation when he made statements to either Haukap or Reese. In addition, he was fully advised prior to the polygraph examination and his subsequent confession of his "Miranda" rights. The totality of the circumstances leads to a conclusion that the statement was voluntary. In view of the above, the motion to suppress the confession and statements is denied.

[¶ 11] We begin our analysis with an iteration of the standard of review that requires us to embrace the factual findings of the district court unless they are clearly erroneous. A confession is not voluntary if it is extracted by threats, coercion, or improper influences or promises. *Burk v. State*, 848 P.2d 225, 230 (Wyo.1993); *Garcia v. State*, 777 P.2d 603, 606–7 (Wyo.1989); *also see Gunn v. State*, 2003 WY 24, ¶ 25, 64 P.3d 716, ¶ 25 (Wyo.2003). A confession obtained by use of false promises in exchange for a waiver of the Fifth Amendment privilege may require suppression of any statement made in reliance upon that promise. *State v. Petitjean*, 140 Ohio App.3d 517, 748 N.E.2d 133, 144–46 (Ohio App. 2 Dist.2000)(defendant informed that if he confessed to murder he would "probably get two years probation," whereas if the police proved he did it "you go bye bye for life, or lose your life."). However, while a confession resulting from a direct or indirect promise of leniency is inadmissible, a police officer's statement to a suspect that cooperating is in his or her best interests is not improperly coercive and does not, as a matter of law, render a confession involuntary. *State v. Sutherland*, 11 S.W.3d 628, 632–33 (Mo.App. E.D.1999) (statement to the effect that if defendant cooperated he may be a good candidate for probation not coercive); *also see A.A. v. State*, 706 N.E.2d 259, 263–64 (Ind. App.1999) (suggesting possibility of minimal punishment in exchange for confession, standing alone, did not render confession inadmissible); *Knight v. State*, 62 Ark.App. 230, 971 S.W.2d 272, 274–77 (1998) (closely divided appellate court upheld trial court's decision not to suppress confession in case where probation was known to police officer not to be a possibility for that crime); and *see generally Holmes v. State*, 598 So.2d 24, 26–28 (Ala.Cr.App.1992) (promises of leniency and probation, coupled with threat with respect to habitual offender status, rendered confession involuntary).

[¶ 12] Wilkins conceded that he was not "promised" probation. His argument rests on his contentions that, by repetition of the prospect of probation, a "promise" arose and, based on that promise, he told the police officers what they wanted to hear even

though the statement he made was not the truth. When coupled with his inability to comprehend instructions, slow learning, test anxiety, and stress avoidance, he further contends that the suggestion of a promise of probation rendered his confession involuntary. Wilkins also suggests that the polygraph test was explained to him in a "coercive" manner, i.e., if he did not pass it, he would be required to tell the police officers what happened.[6] If that did occur, then it is not to be found in the tape-recorded statement. Indeed, our perception of the tape recording is that the questioning was very brief, non-coercive, and in general a cordial conversation between Wilkins and the police officers.

[¶ 13] Wilkins parses the findings of the district court and takes aim at its conclusion that Wilkins' mother was not a credible witness, when both Wilkins' father and fiancé corroborated the mother's testimony, as well as that of Wilkins himself. The district court does take into account that Wilkins and his three witnesses all agreed that probation was the centerpiece of the discussion they had with the police on March 29, 2002, and his decision letter classifies all of their statements as a legitimate, albeit self-serving, view of what they thought they heard. Because that portion of the discussion on that day was not recorded, the district court had to rely on what all the witnesses said. The police said they made no promise of probation. Wilkins concedes that there was no "promise" of probation, and his three witnesses claim such a promise was made, or that such a promise was at least implied by the circumstances. We conclude that the district court's finding that no such promise was made is not clearly erroneous under these circumstances. We also conclude that the district court's finding that Wilkins' learning disability and tendency toward "test

anxiety" was not relevant to these circumstances is also not clearly erroneous. The questions asked of Wilkins were very simple "Yes" or "No" questions, and the process was explained to him thoroughly. The only evidence before the district court on that point was that the polygraph test assumes most persons are "anxious," and the test differentiates from on-going anxiety and the body's physiological response to answering pointed questions untruthfully (an example of such a pointed question is, "Did you have sexual intercourse with [the victim] on December 16, 2000?").

[¶ 14] Wilkins also refers us to an exhaustive list of the factors that are to be taken into account when evaluating the voluntariness of a statement or confession. However, most of those factors were not issues below and, furthermore, the record bears out that they are not relevant in the instant analysis. For instance, it is clear that Wilkins was not in custody, he provided a written waiver of his *Miranda* rights that is rock solid, the questioning after the polygraph test was quite brief and, thus, his will was not overborne by exhaustive questioning. The only factors of merit are Wilkins' contention that he was promised probation and that he had trouble taking tests. We agree with the district court that Wilkins was not promised probation and his asserted "test anxiety" is not a factor rendering his confession involuntary.

## CONCLUSION

[¶ 15] The district court did not err in determining that Wilkins' confession was voluntary and, therefore, admissible at his trial. The judgment and sentence of the district court are affirmed in all respects.

---

6. Because this argument is not supported by any evidence of record, and because Wilkins has not supported it with cogent argument or pertinent authority, we need not address it further. However, we take note that there is an annotation that is of tangential interest to the issues at hand. *See* Joel E. Smith, Annotation, *Admissibility in Evidence of Confession Made by Accused in Anticipation of, During, or Following Polygraph Examination*, 89 A.L.R.3d 230, 235 (1979 and Supp. 2004) ("[I]t may be stated that the accused will in general be unsuccessful in challenging the admissibility of an alleged polygraph-induced confession unless specific coercive conduct or a denial of constitutional rights is shown, as opposed to merely alleging that, in general, the polygraph examination improperly influenced the accused in confessing to the crime involved.").