2005 WY 73

**Robert Leroy SILER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 03–169.

Supreme Court of Wyoming.

July 8, 2005.

Representing Appellant: Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Terry L. Armitage, Special Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, and VOIGT, JJ., and BROOKS, D.J.

VOIGT, Justice.

[¶ 1]   In April 2003, a Sweetwater County jury found Robert Leroy Siler (the appellant) guilty of first-degree murder, a felony, in violation of Wyo. Stat. Ann. § 6-2-101(a) (LexisNexis 2003).   On appeal, the appellant claims that his trial attorneys were ineffective at an evidentiary hearing on the appellant's suppression motion and for conceding the appellant's guilt at trial, that the district court failed properly to instruct the jury on the substantive elements of first-degree murder, and that the district court abused its discretion in denying the appellant's pretrial request for substitute counsel.   We affirm.

## ISSUES

1.   Whether the appellant's trial counsel was ineffective at an evidentiary hearing on the appellant's suppression motion?

2.   Whether the appellant's trial counsel conceded his guilt during voir dire, opening statement, and/or closing argument?

3.   Whether the district court failed properly to instruct the jury on the elements of first-degree premeditated murder?

4.   Whether the district court abused its discretion in denying the appellant's pretrial request for substitute counsel?

### FACTS

[¶ 2] The instant case essentially revolves around the interactions among three people on August 16 and 17, 2002: the appellant, Craig Cunningham (Cunningham), and Cheryl Ward (the victim).[1] Cunningham and the appellant had been acquaintances since 1999. The appellant and the victim had been involved in a rather tumultuous long-term romantic relationship. Cunningham knew of the appellant's romantic relationship with the victim, but Cunningham, too, became romantically involved with the victim in June 2002. Cunningham's relationship with the victim continued, "off and on," until August 13, 2002. As of August 13, 2002, the victim had apparently returned to the appellant's residence.

[¶ 3] Sometime after 4:30 p.m. on August 16, 2002, Cunningham went out to cash his unemployment check and buy some beer. He saw the appellant drinking at a local bar along the way, and Cunningham returned to his residence at about 8:30 p.m. Cunningham drank "a few more beers" and the appellant arrived at Cunningham's residence between 9:30 p.m. and 10:30 p.m. The appellant confronted Cunningham about his relationship with the victim, and Cunningham admitted that he and the victim had been "having sex." The two argued back and forth for a period of time, and each man apparently expressed his love for the victim. Cunningham testified that at some point, the appellant displayed a bone-handled knife with a five- or six-inch blade, put the knife in the back of his truck, and returned with a "couple of beers." The appellant had calmed down, according to Cunningham, and they each drank a beer.[2]

[¶ 4] Cunningham testified that the appellant decided to confront the victim about her relationship with Cunningham, so the appellant drove Cunningham to the appellant's residence. The victim was in the bathroom fixing her hair, and Cunningham overheard the appellant inform the victim that he had discovered the victim's affair with Cunningham. According to Cunningham, the victim denied the affair and the appellant told her that Cunningham was present in the appellant's residence and if she did not believe the appellant, she could ask Cunningham. The appellant and the victim proceeded to argue for about five minutes and the appellant declared that he was "through" with the victim.

[¶ 5] The appellant and Cunningham left the appellant's residence between 10:00 p.m. and 11:00 p.m. The appellant drove Cunningham to a local bar, where, according to Cunningham, they had one or two drinks.[3] The appellant then drove Cunningham to the Rage bar. About an hour later, they left the Rage bar because the appellant "had his head down on the bar and this bartender wanted me [Cunningham] to get him out of there." Cunningham woke the appellant up and testified that the appellant was able to exit the bar and get into his vehicle under his own power. The appellant stated that he was "in no shape to drive" and neither, admittedly, was Cunningham.[4] Nevertheless, Cunningham took the wheel of the appellant's vehicle and experienced some difficulty in starting the vehicle. The appellant was able to tell Cunningham how properly to start the vehicle.

[¶ 6] Cunningham drove the appellant back to the appellant's residence. He esti-

---

1. Cunningham was admittedly an alcoholic during the relevant time period and indicated that he had thirteen prior convictions in Utah for driving while under the influence. At least one of these offenses was a felony, for which Cunningham served time in prison. Cunningham testified at trial that he and the appellant were "heavy drinkers." The appellant's father confirmed that the appellant had a "bad" drinking problem.

2. Cunningham's neighbor testified that she heard the appellant and Cunningham arguing at about 9:15 p.m. or 9:30 p.m. The appellant was "very angry" and yelling, but at some point the situa-

tion calmed and Cunningham and the appellant began to talk in normal tones.

3. The bartender testified that Cunningham and the appellant were at the bar for fifteen or twenty minutes and they each drank a beer. According to the bartender, the appellant remained standing the entire time he was in the bar; the appellant "walked straight" and "talked straight."

4. Cunningham testified that he did not recall the two drinking at the Rage bar and that to this point in the evening he personally observed the appellant consume maybe five or six beers.

mated that they left the Rage bar at 12:00 a.m. or 12:30 a.m., but testified that it could have been later.[5] At the appellant's residence, the appellant offered to let Cunningham stay the night and to take Cunningham home in the morning. The appellant retrieved a blanket so that Cunningham could sleep on the couch; Cunningham drank another beer or two and went to sleep on one couch and the appellant went to sleep on a separate couch.

[¶ 7] Meanwhile, the victim had called her friend JoAnn Richards (who had been drinking beer since noon that day) several times from the appellant's residence to see if Richards would pick her up, but Richards did not do so. The appellant also called Richards at 2:00 a.m.[6] He asked whether Richards had picked up the victim and stated that he was with Cunningham, had been drinking beer, and was returning home. Richards testified that, based on her prior interactions with the appellant, the appellant did not sound as if he was intoxicated. The victim ultimately walked to Richards' residence, arrived shortly after 2:00 a.m., and consumed alcohol. The victim left with some acquaintances between 4:30 a.m. and 5:00 a.m. The acquaintances attempted to drop the victim off at two different residences but no one was home, so the victim directed them to take her to the appellant's residence.

[¶ 8] Cunningham testified that he was awakened at about 5:00 a.m. or 5:30 a.m. by the victim "straddling" him on the couch and kissing him. Although he had been drinking "[q]uite a bit" the previous evening, Cunningham stated that he was not intoxicated, but was "[h]ung over." The appellant woke up about the same time and, upon observing Cunningham and the victim, asked "Just what the f* * * is going on?" The victim, according to Cunningham, told the appellant to "f* * * himself." The appellant was angry, walked back and forth in a "rampage," and told the victim to leave; the victim did not leave. The appellant yelled at the victim for two or three more minutes. Cunningham

got up, put on his boots and sat in a chair next to the dining room table while the appellant and the victim continued to argue. At some point, the victim sat in a separate chair and joined Cunningham at the dining room table. The next thing Cunningham saw was the appellant enter the residence through the front door (presumably after retrieving the knife from the back of his truck) and, without saying anything, walk (in a "normal walk") straight towards the victim. The appellant "reached over with his left hand, grabbed her . . ., bent her back a little bit in the chair" and stabbed her overhand "right square in the chest." Cunningham asked the appellant "what the f* * * he just did" and the appellant, according to Cunningham, responded "I just killed this f* * * * * * b* * * * * " and "If you don't believe me, check her pulse." The appellant then offered Cunningham a ride home, and Cunningham said "I'm out of here" and left the appellant's residence. Cunningham called 911 from another house in the area within four to five minutes of the stabbing. The record reflects that 911 received the call at 5:55 a.m.

[¶ 9] Officer Jason Love responded to the 911 call and discovered the victim's body between two vehicles in the appellant's driveway. He observed marks at the scene indicating that someone dragged the victim's body from the appellant's residence to the driveway. Officer Love spoke with Cunningham at about 6:20 a.m. or 6:30 a.m. and saw no signs that Cunningham was intoxicated at the time. The victim was pronounced dead at the hospital at 6:48 a.m.

[¶ 10] At 6:10 a.m. or 6:15 a.m. that morning, the appellant phoned his friend Mark Lacquement and requested a ride. Lacquement encountered the appellant at about 6:45 a.m. or 6:50 a.m., at which time the appellant stated that he "might be going down this time" and believed the victim had been "stabbed or killed." The appellant ended up back at Lacquement's garage and according

---

5. Officer Jason Love testified that when he interviewed Cunningham the next morning, Cunningham stated that they had "[q]uite a few" drinks at the Rage bar, the appellant was "pretty drunk," and they left the bar at 2:30 a.m.

6. Cunningham testified that he remembered the appellant making a phone call while driving from the Rage bar to the appellant's residence.

to Lacquement, the appellant did not exhibit any signs of intoxication. JoAnn Richards similarly received a telephone call from the appellant at about 7:00 a.m. The appellant twice stated that "he had killed" the victim. According to Richards, the appellant was calm and exhibited no obvious signs that he was intoxicated. The appellant called Richards again between 7:30 a.m. and 7:45 a.m. When Richards asked the appellant how he had killed the victim, he said that he had "stabbed" the victim "in the heart." The appellant also called his father sometime prior to 9:00 a.m., and stated that the victim was dead and that he "killed her."

[¶ 11] Law enforcement officers found the appellant hiding under a car in Lacquement's garage and arrested the appellant. The appellant smelled of alcohol and stated that he had been drinking the previous evening, and officers observed dried blood on the appellant's hands. A knife with blood on it was subsequently discovered in the appellant's kitchen sink, and an examination of the appellant's person did not reveal any injuries to the appellant's body.

[¶ 12] Detective John Elliott interviewed the appellant at 9:29 a.m. on August 17, 2002. During that interview, the appellant stated:

1.  The appellant and Cunningham "ended up talking and become friends until [the victim] showed up and then shit happened;"

2.  The appellant was on one couch, Cunningham was on another couch, and the victim came in drunk and tried to start a fight with the appellant;

3.  The victim started "hugging and kissing on" Cunningham and the appellant repeatedly told her to leave his residence and the victim refused;

4.  The appellant told Cunningham he was going to stab the victim and "don't f* * * with me. I says you're f* * * * * * with the wrong person;"

5.  The appellant had the knife on his "side," "showed" the victim the knife and said "I'm going to do it and she says no you won't and I said watch" and after the second or third time the victim said "you won't do it" the appellant stabbed the victim with a hunting knife—when asked if the appellant

stabbed the victim "out of a fit of anger" or knew "the circumstances that [he would] be in because of" it, the appellant replied, "No I knew what was going to happen;"

6.  The appellant then rinsed some of the blood off of himself and the knife and left the knife in his kitchen sink;

7.  After he stabbed the victim and verified that she was dead, the appellant told Cunningham "you're the one that caused it" because Cunningham had been "having an affair" with the victim—the appellant didn't attack Cunningham because he "wanted to let him see what the f* * * he's done to my life;"

8.  The appellant tried to carry the victim to his pickup (but could not lift her into the pickup) and when he saw law enforcement arrive he "walked off;" and

9.  Cunningham did not participate in stabbing the victim.

It is apparent from the interview that the appellant remained very bitter about past incidents between himself and the victim in which the appellant felt he had been unjustly arrested.

[¶ 13] An autopsy revealed that the cause of the victim's death was a stab wound to the chest, and a forensic pathologist estimated that the victim died within two to five minutes of the stab wound. The wound path proceeded "front to back and slightly downward" and the weapon used to inflict the wound perforated the right ventricle and right atrium of the victim's heart, perforated her pulmonary artery, and cut her coronary artery in half; according to the forensic pathologist, a "significant amount of force" was required to inflict a wound of this nature. The victim's blood alcohol level at the time of her death was .284. DNA testing confirmed that the dried blood on the appellant's right hand, the blood on the knife retrieved from the appellant's kitchen sink, and blood found at the appellant's residence, was the victim's blood.

[¶ 14] The appellant was ultimately charged with first-degree premeditated murder in violation of Wyo. Stat. Ann. § 6–2–101. Two public defenders appeared on the appel-

lant's behalf at trial. On April 11, 2003, a Sweetwater County jury found the appellant guilty of that offense. The district court sentenced the appellant to imprisonment for life, and the appellant now appeals from the district court's judgment and sentence.

## DISCUSSION

### Ineffective Assistance of Counsel

[¶ 15] The appellant claims that his trial counsel were ineffective in two respects: (1) at an evidentiary hearing on the appellant's suppression motion; and (2) by conceding the appellant's guilt during voir dire, opening statement, and closing argument.

### Standard of Review

[¶ 16] Claims of ineffective assistance of counsel are reviewed under the following standard:

"When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo. 1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo.1995); *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In

other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to 'render such assistance as would have been offered by a reasonably competent attorney' and that 'counsel's deficiency prejudiced the defense of the case.' *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064."

*Asch [v. State*, 2003 WY 18, ¶ 11, 62 P.3d 945, 950 (Wyo.2003) ] (*quoting Becker v. State*, 2002 WY 126, ¶ 12, 53 P.3d 94, ¶ 12 (Wyo.2002); *Reyna v. State*, 2001 WY 105, ¶ 19, 33 P.3d 1129, ¶ 19 (Wyo.2001); *Chapman v. State*, 2001 WY 25, ¶ 6, 18 P.3d 1164, ¶ 6 (Wyo.2001); *Grainey v. State*, 997 P.2d 1035, 1038–39 (Wyo.2000)). The burden of proving that counsel was ineffective rests entirely on an appellant. *Asch*, at ¶ 11 (citing *Barkell v. State*, 2002 WY 153, ¶ 10, 55 P.3d 1239, ¶ 10 (Wyo.2002)). To satisfy his burden, an appellant must provide more than mere speculation or equivocal inferences. *Sincock v. State*, 2003 WY 115, ¶ 37, 76 P.3d 323, ¶ 37 (Wyo.2003) (citing *Barkell*, at ¶ 13).

*Duke v. State*, 2004 WY 120, ¶ 36, 99 P.3d 928, 943 (Wyo.2004). We have further stated that the appellant

"must demonstrate the existence of a reasonable probability that, absent that deficiency, the result of the proceedings would have been different. Counsel's ineffectiveness must be so serious as to undermine this court's confidence that the outcome was fair. *Laing v. State*, 746 P.2d 1247, 1248–49 (Wyo.1987); *Gist v. State*, 737 P.2d 336, 342 (Wyo.1987); *Frias v. State*, 722 P.2d 135, 145–47 (Wyo.1986)."

*Rutti v. State*, 2004 WY 133, ¶ 23, 100 P.3d 394, 405 (Wyo.2004) (*quoting Lower v. State*, 786 P.2d 346, 349–50 (Wyo.1990)). A failure to "make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*

*v. Washington,* 466 U.S. 668, 700, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Indeed, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. 2052.

### The Suppression Motion

#### A. THE MOTION AND EVIDENTIARY HEARING

[¶ 17] The appellant was interviewed by law enforcement the morning of August 17, 2002. On March 11, 2003, the appellant's trial counsel filed a Motion to Suppress, challenging the voluntariness of the appellant's statements during that interview because the appellant "was intoxicated. . . ." The district court held an evidentiary hearing March 27, 2003, at which hearing the prosecution called three witnesses: Sheriff's Deputy Jason Love, Detention Officer Brad Freeman and Detective John Elliott. The appellant's trial counsel cross-examined each of these witnesses, but did not call any additional witnesses on behalf of the appellant. The prosecution also offered several exhibits during the hearing (including a videotape of the appellant at the detention center, "book in" forms completed at the detention center, a "Miranda Rights" form and waiver, and the tape-recorded interview with the appellant), which exhibits the district court admitted into evidence.

[¶ 18] Officer Love testified that he and another officer arrested the appellant for the instant offense at about 8:39 a.m. on August 17, 2002. The officers handcuffed the appellant's hands behind his back (each officer also had a hand on the appellant's arm for security purposes) and the appellant walked one hundred-fifty to two hundred feet to a patrol vehicle. Officer Love detected a "slight odor" of alcohol on the appellant, but testified that the appellant walked "without difficulty" and did not stumble or stagger. The appellant made a few statements on the way to the detention center and according to Officer Love, the appellant was logical and did not slur his speech. At the detention

center, Officer Love asked the appellant for basic information such as his height, weight, address, telephone number, birth date, social security number, occupation, and the appellant's father's address and phone number, which information the appellant provided without hesitation or confusion. Officer Love then walked with the appellant to the sheriff's office for the interview and, according to Officer Love, the appellant did not exhibit any balance deficiencies while standing or walking. Officer Love testified that the appellant complied with the officers' directives at all relevant times, and Officer Love did not observe any signs that the appellant was intoxicated. Officer Love interacted with the appellant twice after that day, and noted that the appellant's speech and mannerisms on the two subsequent occasions did not differ from what the officer observed on August 17, 2002.

[¶ 19] Officer Freeman testified that at 9:10 a.m. on August 17, 2002, he booked the appellant into the detention center. Officer Freeman performed a "pat down" of the appellant's entire body for contraband and weapons, and asked the appellant several screening questions.[7] According to Officer Freeman, the appellant did not stagger, lose his balance, or slur his speech at any time, and the appellant responded logically, accurately, and without hesitation to Officer Freeman's inquiries. Officer Freeman did not smell alcohol on the appellant and saw "no signs of any kind" that the appellant was under the influence of alcohol or drugs; accordingly, Officer Freeman did not ask the appellant if he had consumed any alcohol and did not perform a breathalyzer test or a gaze nystagmus test. Officer Freeman subsequently interacted with the appellant five times per week (between August 17, 2002, and March 27, 2003) and did not observe the appellant act any differently than he did August 17th.

[¶ 20] Detective Elliott began interviewing the appellant in the sheriff's office squad room at 9:29 a.m. and concluded the inter-

---

7. Officer Freeman noted on a "book in" form that the appellant did not appear disoriented, confused or unconscious, and did not exhibit any signs of alcohol or drug influence.

view at 9:46 a.m.[8] By this time, the detective had spoken to "neighbors and such" who stated the appellant had been drinking "some" the previous evening. Detective Elliott examined the appellant's eyes, listened to his speech at the detention center, and observed the appellant walk; the detective concluded that the appellant was not intoxicated, nor did the detective observe any signs of intoxication during the interview.

[¶ 21] The detective advised the appellant of his *Miranda* rights prior to the interview, and according to the detective, the appellant verbally indicated that he understood these rights and also later initialed and signed a "Miranda Rights" form[9] indicating he understood, and agreed to waive, these rights.[10] The detective tape-recorded the interview, and we have previously summarized the statements the appellant made during the interview. The tone of the interview is perhaps best reflected by the detective's first substantive question to the appellant: "Okay ah Robert would you like to tell me your side of the story, what happened?" It is apparent from a transcript of the interview that the appellant was responsive and gave coherent, detailed answers to the detective's questions and that the appellant was able to converse with the detective. The following colloquy further illustrates the appellant's ability to understand the nature and consequences of his statements:

> ELLIOTT: So the argument was still in full bloom and going strong and-
>
> SILER: Yes it was
>
> ELLIOTT: So then what happened?
>
> SILER: I don't know if I dare say

ELLIOTT: Okay. What did ah, what did the guy with you do?

SILER: He says, well no I ain't, I ain't going to

ELLIOTT: Okay. So ah do you want to end this conversation or . . .

SILER: Yeah, until I talk to an attorney.

ELLIOTT: Okay

SILER: If, if they want to give me one if not I don't give a shit

ELLIOTT: Alright, it's totally up to you if you want to [talk to] us but if you want [to] talk to an attorney we need to conclude this conversation right now. You know what I mean?

SILER: I'm not trying, I'm not going to try and bail out of this, I'm guilty I know it

ELLIOTT: Okay ah but do you want to stop the conversation now is what I'm asking. I can't ask you any questions okay? What do you want to do?

SILER: Well in fact I'll tell you. Piss on it. I don't give a shit. I got nothing to lose.

ELLIOTT: So you don't want an attorney at this time?

SILER: No, piss on it.

Notably, the appellant also addressed his level of intoxication at the time of the stabbing (roughly almost four hours prior to the interview):

> ELLIOTT: . . . Ah have you, had you been drinking all night?
>
> SILER: No

---

8. For contextual purposes, trial testimony indicated that the appellant and Cunningham left the Rage bar between 12:30 a.m. and 2:30 a.m., the appellant admittedly slept for two hours in the interim, and the stabbing occurred at roughly 5:40 a.m.

9. The appellant's hands were bagged at the time of the interview to preserve potential blood evidence, and the appellant actually initialed and signed the "Miranda Rights" form at 10:40 a.m., about an hour after Detective Elliott actually advised the appellant of his Miranda rights. A handwritten notation on the form, which notation was initialed by the appellant, states that he was informed of his rights prior to giving the

statement but signed the form after the paper bags were removed from his hands.

10. In addition to initialing each right listed on the "Miranda Rights" form, the form contained the following advisement:

> I HAVE READ THIS STATEMENT OF MY RIGHTS AND I UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS. I DO NOT WANT A LAWYER AT THIS TIME. I UNDERSTAND AND KNOW WHAT I AM DOING. NO PROMISE OR THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OR COERCION OF ANY KIND HAS BEEN USED AGAINST ME.

ELLIOTT: Okay had you been sleeping any? Prior to this happening?

SILER: In fact yeah. I slept about 2 hours.

ELLIOTT: Okay. Were you ah were you at that time intoxicated? Did you feel like you were intoxicated, had you been drinking that much?

SILER: No

Detective Elliott did not specifically ask the appellant how much alcohol he had consumed the previous evening.

[¶ 22] The district court ultimately denied the appellant's suppression motion. The district court found that there was "evidence that the [appellant] may have consumed some alcoholic beverages the night before," but that the appellant was "calm, alert, attentive and responsive" and exhibited "no outward signs of being under the influence of alcohol to the extent contended by [his trial counsel]" during the interview; therefore, considering the applicable legal factors, the district court concluded that the State had "met its burden of proof in establishing that the statements of the [appellant] were made voluntarily." The statements at issue were later admitted into evidence at trial.

### B. DISCUSSION

[¶ 23] On appeal, the appellant argues that his trial counsel were ineffective because at the suppression hearing, they did not present "any of the significant information [they] possessed" in support of the suppression motion. The appellant contends that the following evidence was "strongly supportive of [his] intoxication" and if his trial counsel had presented the evidence at the suppression hearing, the district court would have granted the suppression motion:

1. In his 5:55 a.m. 911 telephone call, Cunningham indicated that the appellant and the victim had been drinking. The appellant claims that Cunningham also testified at trial that the appellant was "quite intoxicated" the

evening prior to his interview with law enforcement.

2. The appellant's trial counsel stated to the district court at trial that a bartender from the Rage bar would testify that the appellant was "extremely intoxicated" and passed out in the bar the evening of August 16th. However, the bartender apparently said that she did not serve the appellant any drinks and served Cunningham "maybe one drink."

3. The appellant's trial counsel also stated to the district court at trial that the victim's daughter would testify that she awakened the appellant at 5:00 a.m. August 17th; she observed a "strong odor" of alcohol and the appellant was "passed out...." When the daughter asked the appellant where the victim was, the appellant stated that the victim was "sleeping" even though the victim was not at the appellant's residence at the time.

According to the appellant, the admission of his confession into evidence at trial further prejudiced him in that the prosecution relied heavily on his statements to establish the requisite premeditation for first-degree murder.[11]

[¶ 24] Generally, the Fifth and Fourteenth Amendments to the United States Constitution, and Wyoming Constitution Article 1, §§ 6 and 11, require that confessions be voluntary. A statement that is obtained by coercion is not trustworthy and may not be used at trial against the person who made it. A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial. A statement is considered to be voluntary if the defendant of his own free and deliberate choice, and not because of intimidation, coercion or deception, makes it. The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary. *Edwards v. State*, 973 P.2d 41, 48 (Wyo.1999).[12]

---

11. The appellant does not argue that any ineffectiveness of counsel or other error occurred at trial with respect to the voluntariness issue.

12. "'Once the State has met its burden and rebutted the presumption of involuntariness, the defendant may be required to present evidence demonstrating the involuntariness of his statements.'" *Lewis v. State*, 2002 WY 92, ¶ 18, 48

*Lara v. State,* 2001 WY 53, ¶ 9, 25 P.3d 507, 510 (Wyo.2001). "In determining voluntariness, a court examines the totality of the circumstances that existed when the statements were made." *Gunn v. State,* 2003 WY 24, ¶ 18, 64 P.3d 716, 722 (Wyo.2003). Factors that a trial court may consider in making that determination include:

"[T]he atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made[,]"

. . .;

"whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system."

*Simmers v. State,* 943 P.2d 1189, 1195–96 (Wyo.1997) (*quoting State v. Evans,* 944 P.2d 1120, 1125–26 (Wyo.1997); *People v. Gennings,* 808 P.2d 839, 845 (Colo.1991) and *People v. Pearson,* 725 P.2d 782, 783 (Colo. 1986)).

[¶ 25] Intoxication from alcohol does not per se establish involuntariness. *State v. Baker,* 4 Kan.App.2d 340, 606 P.2d 120, 123 (1980); and *State v. Tucker,* 32 Wash.App. 83, 645 P.2d 711, 713 (1982).

Instead, for intoxication to render a confession involuntary, the impairment must be so great as to deprive an individual of a capacity to understand the meaning of his statements. See *Lee v. State,* Okla.Crim., 700 P.2d 1017, 1020 (1985). Even though a defendant appears intoxicated, the fact that he understood what he was doing, carried on a conversation and responded to questions will render the statements admissible. *State v. Curry,* 127 Ariz. 1, 617 P.2d 785, 787 (App.1980). The proper inquiry regarding intoxication is whether a confession cannot be said to be the product of rational intellect and free will because of extreme intoxication. *State v. Corona,* 60 Or.App. 500, 655 P.2d 216, 219–220 (1982).

*Stone v. State,* 745 P.2d 1344, 1348 (Wyo. 1987). We have also stated:

"The general rule applicable to confessions obtained from persons under intoxication has been well stated to the effect that 'proof that the accused was intoxicated at the time he confessed his guilt of crime will not, without more, bar the reception of the confession in evidence. But if it is shown that the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements, then the confession is inadmissible.' . . ."

. . .

"Lack of awareness or understanding alone might be sufficient to exclude a confession in the rare case where it clearly appears that at the time of the confession the confessant was so intoxicated as to lack mental capacity, that is, he was unable to appreciate the nature and consequences of his statements. This, no doubt, is the 'mania' referred to in the older cases."

*Lonquest v. State,* 495 P.2d 575, 582 (Wyo.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972) (*quoting People v. Schompert,* 19 N.Y.2d 300, 279 N.Y.S.2d 515, 226 N.E.2d 305, 308, *cert. denied,* 389 U.S. 874, 88 S.Ct. 164, 19 L.Ed.2d 157 (1967)). Indeed, the key question remains:

"Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess,

P.3d 1063, 1068 (Wyo.2002) (*quoting Mitchell v.* State, 982 P.2d 717, 721 (Wyo.1999)).

it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (*quoting Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). *See also Hannon v. State*, 2004 WY 8, ¶ 51, 84 P.3d 320, 340 (Wyo.2004).

[¶ 26] The totality of the circumstances based on the testimony and exhibits received at the suppression hearing, when considered in light of the aforementioned factors, clearly supported the district court's findings and conclusion that the appellant's confession was voluntary.[13] The additional evidence the appellant has referenced on appeal is somewhat more specific and probative of the appellant's level of intoxication the evening prior to his interview with Detective Elliott.[14] However, the appellant has not established on appeal that, had the evidence been presented at the suppression hearing, there was a reasonable probability that his statements would have been declared involuntary.[15] The additional evidence simply does not sufficiently undermine the district court's findings and conclusion based on the evidence presented at the hearing.

[¶ 27] While the "voluntariness of a confession is a question to be determined by considering the facts of each case," *Stone*, 745 P.2d at 1348, it is worth noting that we have affirmed the denials of suppression motions in cases involving much stronger evidence of intoxication at the time of questioning (even considering the additional evidence at issue in the instant case). For example, in *Lonquest*, 495 P.2d at 580–81, the defendant's "extremely high" blood alcohol content was .374 one and one-half hours before his confession. Testimony at the suppression hearing revealed that the defendant had been informed of his *Miranda* rights, that he

> gave lucid and responsive replies to questions, that he had no hallucinations or delusions, that he recognized people, and that he corrected and in some cases argued ... about correct statements, particularly when [it was] suggested to defendant that this killing had occurred on the spur of the moment and not as the result of a plan to kill [the] deceased.

*Id.* at 580. Both parties also presented expert testimony on the issue. *Id.* at 582. We concluded that "there was sufficient evidence upon which the trial judge could base his finding that the confession was knowingly and voluntarily made." *Id.* at 582.

[¶ 28] In *Stone*, 745 P.2d at 1347, the

> rather lengthy suppression hearing, which resulted in admission of the challenged statements, involved six state witnesses and two witnesses for appellant. Those witnesses were aware that at the time of

---

13. Our standard for appellate review of the denial of a suppression motion is as follows:
    > A trial court's ruling on a defendant's motion to suppress a statement on the grounds that it was made involuntarily is reviewed *de novo*. In conducting such a review, we defer to the trial court's findings of fact unless those findings are clearly erroneous. This Court considers all the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses.

    *Lara*, 2001 WY 53, ¶ 9, 25 P.3d at 510.

14. It is perplexing that the appellant's trial counsel did not present this evidence at the suppression hearing, but the record is silent as to why that did not occur.

15. A reasonable probability "is a probability sufficient to undermine confidence in the outcome

of the trial." *Olsen v. State*, 2003 WY 46, ¶ 81, 67 P.3d 536, 567 (Wyo.2003).

The appellant's burden to show prejudice resulting from the alleged ineffectiveness of counsel at the suppression hearing is akin to the showing required for failing to file a suppression motion: "[p]rejudice to a defendant can only be shown where, had the motion been made, it would have been granted, and had the evidence been suppressed, ' "only a limited amount of evidence was available to the prosecution to support a conviction." ' " *Page v. State*, 2003 WY 23, ¶ 8, 63 P.3d 904, 909 (Wyo.2003) (*quoting Lancaster v. State*, 2002 WY 45, ¶ 59, 43 P.3d 80, 102 (Wyo.2002) and *Dickeson v. State*, 843 P.2d 606, 612 (Wyo.1992)); and *see Bloomquist v. State*, 914 P.2d 812, 821 (Wyo.1996). *See also Shackleford v. Hubbard*, 234 F.3d 1072, 1080–81 (9th Cir.2000), *cert. denied*, 534 U.S. 944, 122 S.Ct. 324, 151 L.Ed.2d 242 (2001).

appellant's arrest, he experienced a certain degree of intoxication.... [A]ppellant's blood alcohol level at about 7:50 the morning of the shooting was at or between 0.15 and 0.20. Appellant was not questioned before 7:04 a.m. on the 19th of May because Chief Wilcock believed him to be too intoxicated. At the time of appellant's questioning, a slight odor of alcohol was detected. According to the Chief appellant answered questions intelligently and his speech was not slurred. He did not appear to be intoxicated. Appellant did not stagger, stumble or fall and walked without assistance. The Chief said he would not have questioned appellant if he had been significantly intoxicated.

After evaluating the applicable legal authority and noting that it would "be improper for the trial court to rely exclusively on blood alcohol level," this Court concluded that the "trial court made a factual determination and legal conclusion that under the totality of the circumstances, appellant's statements were given voluntarily and were not rendered inadmissible because of intoxication" and that "the trial court properly admitted the statements of appellant into evidence." *Id.* at 1348. *See also Gordon v. State,* 2004 WY 105, ¶¶ 15–17, 97 P.3d 64, 68–69 (Wyo.2004); *Mayer v. State,* 618 P.2d 127, 128–30 (Wyo. 1980); and *Hernandez v. State,* 587 P.2d 1094, 1095–96 (Wyo.1978).[16] We find the evidence in the instant case equally convincing that the appellant's confession was voluntary despite his consumption of alcoholic beverages during the previous evening.

### Concession of Guilt

[¶ 29] The appellant also asserts that his trial counsel were ineffective because they conceded the appellant's guilt to the jury during voir dire, opening statement, and closing argument. The appellant claims that he did not consent to this approach at trial because: (1) he entered a "not guilty" plea; (2) he stated at a pretrial hearing on his request for substitute counsel that he wanted his attorneys to find out "what ... happened" and was concerned that his attorneys had made "no attempts to establish any proof that I did it or that I did not do it;" and (3) expressed similar concerns at a post-trial hearing on the appellant's request for substitute counsel at sentencing.[17] According to

16. *See also, for example, Boggs v. Bair,* 892 F.2d 1193, 1198–99 (4th Cir.1989), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990); *Mallott v. State,* 608 P.2d 737, 743 (Alaska 1980); *State v. Rowe,* 479 A.2d 1296, 1299 (Me.1984); *State v. Lamb,* 213 Neb. 498, 330 N.W.2d 462, 466–67 (1983); Wanda Ellen Wakefield, Annotation, *Sufficiency of Showing that Voluntariness of Confession or Admission was Affected by Alcohol or Other Drugs,* 25 A.L.R.4th 419 (1983 and Supp.2004); and 3 William E. Ringel, Searches & Seizures Arrests and Confessions § 25:15 (2d ed.2005).

17. The record is not conclusive as to whether the appellant consented to the particular approach at issue. At a pretrial hearing on the appellant's request for substitute counsel, the appellant was concerned that his counsel had "made no attempts to establish any proof that I did it or that I did not do it." Amidst the discussion of several concerns expressed by the appellant, one of the appellant's attorneys mentioned that a "conflict in what type of defense, whether it's a trial on the merits that [the appellant] is not guilty or if it would be a defense of a lesser included offense" can "[s]ometimes ... present communication problems." In addition, co-counsel responded as follows to the appellant's concern that he had only met with that attorney one time:

... I'm not required to meet with him on a daily basis, weekly basis. He's never made any request to meet with me. I've met with [co-counsel] many, many times about this case, been in contact with it. Basically I've done jury instructions on this case, I've done an investigation, directed investigators on this case, and just because I haven't met with him doesn't mean anything.

...

... [I]f the Court relieves us, we'll just have to get new counsel and they're going to have exactly the same kind of problems with [the appellant] that we have because, obviously, [the appellant] wants to go on a different direction than his confession, what the evidence indicates, and wants to go on a different direction on his trial....

... [W]e're doing everything we possibly can for [the appellant]. We're investigating his case, we're doing jury instructions, we're getting ready for trial. And we're simply just not doing what he wants us to do with it, but that's a problem that's going to exist down the line.

It is not clear from this discussion whether the object of the tension between counsel and the appellant was solely the extent of the investigation into the circumstances surrounding the stabbing (although we note that the evidence that the appellant himself stabbed the victim was overwhelming, counsel represented that an investigation had been conducted and perhaps the appellant was simply not aware of the extent of that

the appellant, this is one of the rare cases in which we should presume that he was prejudiced by his attorneys' approach and grant him a new trial.

[¶ 30] The remarks at issue appear at several different places in the record. We will quote extensively from the record in order to provide the entire context of these remarks. During voir dire, one of the appellant's attorneys was questioning a juror who indicated alcoholism in her family might affect her ability to be an impartial juror. The appellant's attorney informed the prospective juror that alcohol consumption might "affect the degree of severity of the particular crime in this case" and further stated:

Okay. So consequently, when you look at the case from an overall perspective, understanding that in this case we're not denying that our client actually killed [the victim] at all, we're not denying that at all, but in this particular case the defense really revolves around what degree of guilt is in this particular case, based upon the amount of alcohol use that my client had that particular night. That's our case.

investigation due to communication issues between counsel and the appellant, the appellant acknowledged during the hearing that the public defender's investigator had recently personally assisted him, and the appellant did not specify during the hearing precisely what he wanted), or whether it also encompassed a misunderstanding or miscommunication as to how to defend the case in general, the particular trial strategy at issue on appeal, or other unknown issues resulting from counsel's consultations with the appellant. The referenced remarks were very general in nature and were expressed in "piecemeal" fashion, further impairing this Court's ability to evaluate the circumstances.

At a hearing on the appellant's post-trial request for substitute counsel at sentencing, the appellant stated that his counsel

sent [him] the opening statement and I disagreed with that. He was going to print up two more, two different ones, supposed to show me them. He didn't show me copies of them prior to the trial....

And then we go to the trial, he's got—he comes up with this, "[the appellant] is guilty of this, you know, of killing [the victim,]" and tells the jury not to accept this statement and that it's just hearsay.

"I do not remember what happened the evening of this incident or the morning, and I've ... tried to tell both of my attorneys that from the very start. And I asked for help to try and find out what did happen because I have no recollection

. . .

. . . So based upon that, as you sit here now—you know that [the appellant] is not guilty. He's presumed to be innocent. As we sit here now, he's not guilty. So consequently, as you sit here, you can put that aside and judge this case fairly and impartially, can't you?

The following later occurred in response to this exchange:

[Appellant's trial counsel]: . . . First off, could I see a raise of hands from the prospective jurors, as we sit here today before taking any evidence in the case, how many people think that [the appellant] is guilty as he sits here today? How many people think he's innocent?

Okay, sir?

. . .

[Prospective Juror]: Your attorney there, the guy in the pencil tie, said this morning that there's no doubt that your client killed the woman. I didn't get that out of the newspaper or hear it on the radio, I heard it from him.

of what ... went on." Counsel responded that he was

stuck because there's attorney/client privilege and anything I say that would go against what [the appellant] says, is going to be detrimental to him.... I've taken this abuse for eight months. I poured my heart and soul into that trial and everything was great after my closing statement, and now things have changed."

It is not clear from this discussion what, substantively, was contained in the opening statement referenced by the appellant, to which part of that opening statement the appellant objected, whether a new strategy or opening statement was subsequently developed, or precisely what counsel had discussed with the appellant in this regard. Further, trial counsel's remarks indicate that he would dispute the appellant's version of what occurred to some unknown extent, and that all seemed to have been well between counsel and the appellant during the trial until the appellant received an unfavorable verdict.

It does not appear that the appellant requested a hearing on this issue pursuant to *Calene v. State*, 846 P.2d 679 (Wyo.1993) in order to establish a more complete record. We note that issues of this nature often traverse a very fine line. We have previously explained the duties of defense counsel to his client, as well as the manner in which conflicts of this nature could be better preserved in the record. *See Grainey v. State*, 997 P.2d 1035, 1040–41 (Wyo.2000).

[Appellant's Trial Counsel]: . . . You will not hear from the defense that [the appellant] did not stab [the victim]. What you'll hear is that there are varying degrees when someone's actions take a human life. The State legislature has said there's first degree homicide, second degree homicide and manslaughter, depending on the facts and the circumstances of that defendant's actions.

Okay. So I guess my point is, as we sit here today, no evidence has been put on as to the elements of first degree homicide, which are more than just a stabbing of someone. So based upon that, wouldn't it be a fact, does anybody disagree, that he's innocent until the State proves him guilty? Does anybody disagree with that?

[A prospective juror] had talked about that the defense and the State had to prove to him their side of the case. [Prospective Juror], do you still think that [the appellant] has to put on evidence if the State does not prove their side of the case, their elements of the crime?

. . .

[Appellant's Trial Counsel]: Do you understand, I guess, the point I was making, that the State has to prove every element of the crime that is charged, and that in addition to [the appellant] stabbing [the victim], there's different elements for that first degree homicide, and until the State meets their burden, that my client is innocent of that charge? Do you have any qualms or disagreements about that?

. . .

[Appellant's Trial Counsel]: I just have a few more questions. [The prosecutor] had brought up questions revolving around domestic violence. And in this case, [the appellant] stabbed [the victim,] who was his girlfriend.

[¶ 31] One of the appellant's attorneys made the following remarks during his opening statement:

No, I'm not going to stand up at this point or any point in this trial, or nor will [co-counsel], and look each of you in the eye and tell you that [the appellant] did not stab [the victim]. I'm not going to tell you that his actions did not take the life of another human being. The evidence is overwhelming that his actions did take that life. [The appellant] took a hunting knife and he stabbed [the victim.] There was a witness to the stabbing, as [the prosecutor] stated. [The appellant] fled and [the appellant] confessed to the police that, yes, he did stab [the victim]. . . .

. . . The reason we're here is not to decide if [the appellant] is guilty of stabbing [the victim.] He did stab her. The reason we're here is that the State and the prosecutor has charged [the appellant] with first degree homicide.

Now, there are several other charges that [the appellant] could have been charged with or that you as the jury could find him guilty of. . . .

. . . I'm sure we've all heard that term, "manslaughter." And I will submit to you that that's what the evidence will show in this case. Not a first degree homicide, as [the] prosecutor . . . states, a crime of passion.

. . .

But also, I submit to you that after listening to the evidence and the evidence of [the appellant's] drunkenness on that morning and his lack of sleep, his toxic relationship with [the victim], in this argument, that rage that was fueled by jealousy from this newly formed triangle of love, fueled intensely by jealousy and intoxication, that these factors led [the appellant] into this rage, to the state of mind where jealousy and anger—not at this point alcohol consuming him, but jealousy and anger and rage.

These factors and the evidence you will hear, the evidence that you will see this week, I submit will not lead you to first degree homicide, as the State wants you to believe, but will lead you to what the State Legislature has said was manslaughter, a crime of passion. Thank you.

[¶ 32] During his closing argument, one of the appellant's attorneys again stated more than one time that the appellant "stabbed" the victim, in addition to the following:

It's important to note at the outset that in my opening statement I told you that I would not stand up here and look each and every one of you in the eye, and that I was not going to tell you [the appellant] did not stab [the victim]. . . .

So right at the outset we told you what this case was about. . . .

. . .

. . . the heat of passion.

That's what the case is about. It's what our story is about, our movie. We're no fluff. We're talking about a love triangle. We're talking about a limited amount of durational time here. When you apply the facts of our movie, of the Manslaughter case with the law, you come to one conclusion, that [the appellant] is guilty, yes, but he is guilty of a crime of passion, heat of passion. He'[s] guilty of Manslaughter. Thank You.

[¶ 33]   An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland [v. Washington]*, 466 U.S. [668] at 688, 104 S.Ct. 2052 [80 L.Ed.2d 674 (1984) ]. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S. 400, 417–418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

A guilty plea, we recognized in *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), is an event of signal significance in a criminal proceeding. By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers. *Id.*, at 243, 89 S.Ct. 1709. While a guilty plea may be tactically advantageous for the defendant, *id.*, at 240, 89 S.Ct. 1709, the plea is not simply a strategic choice; it is "itself a conviction," *id.*, at 242, 89 S.Ct. 1709, and the high stakes for the defendant require "the utmost solicitude," *id.*, at 243, 89 S.Ct. 1709. Accordingly, counsel lacks authority to consent to a guilty plea on a client's behalf, *Brookhart v. Janis*, 384 U.S. 1, 6–7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); moreover, a defendant's tacit acquiescence in the decision to plead is insufficient to render the plea valid, *Boykin*, 395 U.S., at 242, 89 S.Ct. 1709, 23 L.Ed.2d 274.

*Florida v. Nixon*, —— U.S. ——, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004).

[¶ 34]   The United States Supreme Court has stated:

*Cronic* recognized a narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense. *Cronic* instructed that a presumption of prejudice would be in order in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." [*United States v. Cronic*,] 466 U.S. [648] at 658, 104 S.Ct. 2039 [80 L.Ed.2d 657 (1984) ]. The Court elaborated: "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.*, at 659, 104 S.Ct. 2039; see *Bell v. Cone*, 535 U.S. 685, 696–697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (for *Cronic's* presumed prejudice standard to apply,

counsel's "failure must be complete"). We illustrated just how infrequently the "surrounding circumstances [will] justify a presumption of ineffectiveness" in *Cronic* itself. In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, under-prepared attorney in a complex mail fraud trial. 466 U.S., at 662, 666, 104 S.Ct. 2039.

*Nixon*, 125 S.Ct. at 562. In Wyoming, we have set forth the following analytical framework:

> Although we ordinarily adhere to the *Strickland* test in reviewing claims of ineffective assistance of counsel and require a showing of deficient performance coupled with prejudice, there is a narrow class of cases where the "circumstances . . . are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), . . . The complete denial of counsel is one such circumstance. *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039. Another exists where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* . . . Where such circumstances are shown to exist, prejudice will be presumed without inquiry into the actual performance at trial. *Id.* Wyoming recognizes this narrow line of cases in which prejudice is presumed. *Olsen v. State*, 2003 WY 46, ¶ 75, 67 P.3d 536, ¶ 75 (Wyo.2003) (citing *Herdt v. State*, 816 P.2d 1299, 1301–02 (Wyo. 1991)).

> Among the many jurisdictions that have applied the *Cronic* test, a number, including Wyoming, have done so in cases involving a concession of guilt by the defendant's counsel. *Olsen*, 2003 WY 46, 67 P.3d 536. Such a concession, it is reasoned, constitutes a failure on the part of defense counsel to subject the prosecution's case to meaningful adversarial testing. . . .

> Under the *Cronic* analysis, concessions of guilt by counsel are deemed per se prejudicial where such concessions amount to a failure on the part of defense counsel to subject the prosecution's case to meaningful adversarial testing. In the words of the *Brown* court, it is only where the record as a whole demonstrates that counsel acted less like an adversary and more like an advocate for the state that a breakdown in the adversarial process occurs rendering the outcome of the proceeding unreliable and violating the right to effective assistance of counsel. *Brown [v. Rice]*, 693 F.Supp. 381 [ (W.D.N.C.1988) ].

*Sincock v. State*, 2003 WY 115, ¶¶ 38–39, 56, 76 P.3d 323, 337, 341 (Wyo.2003).

[¶ 35] We considered a nearly identical issue in *Olsen v. State*, 2003 WY 46, 67 P.3d 536 (Wyo.2003). Olsen was convicted of "capital/first degree murder and robbery" for killing three people and robbing a bar. *Id.* at ¶¶ 2, 4, 67 P.3d at 546, 547. Olsen confessed that he had killed the three victims to his mother and also several different times to law enforcement. *Id.* at ¶¶ 6, 8–9, 67 P.3d at 548–49. Olsen entered a not guilty plea. *Id.* at ¶ 11, 67 P.3d at 549. At trial, his counsel told the prospective jury panel during voir dire that

> Olsen admitted his guilt, and the single issue before them was whether he had committed first degree murder or second degree murder. Defense counsel explained that intoxication was a defense to first degree murder, and he intended to show that Olsen did not premeditate the murders.

*Id.* at ¶ 14, 67 P.3d at 550. In particular, counsel stated:

> "Ladies and gentlemen, before we start I'm going to tell you, I'm going to admit to you, that the issue in this case will not involve who did the shootings. That won't be the issue. We admit, ladies and gentlemen, that Martin Olsen shot all three of the individuals concerned in this case; Emma McCoid, Kyle Baumstarck, Art Taylor. That he did that on the evening of January the 20th, we admit that, that he shot them. They were facedown and he shot them in the back of the head. That he took money from that establishment and he left. He was ultimately captured near Buffalo. We admit all those facts, ladies and gentlemen, they are facts. They are there. He's confessed to it. . . .

He's not only confessed to police officers he's confessed to his mother.

So before we start, I wanted to get that on the table. That won't be an issue. Okay. Do all of you understand then what I just told you? Do all of you understand that? What will be an issue in this particular case, ladies and gentlemen, is the degree of guilt. That's why we're here."

*Id.* at ¶ 70, 67 P.3d at 563.

[¶ 36] The jury was ultimately instructed on first-degree murder, felony murder, second-degree murder, aggravated robbery, simple robbery, and larceny. In its closing argument, the defense attacked the State's evidence, emphasized the evidence as to Olsen's intoxication, and asked the jury for a verdict of second-degree murder. *Id.* at ¶ 19, 67 P.3d at 551. The jury found Olsen guilty of three counts of first-degree premeditated murder, three counts of felony murder, and aggravated robbery, and sentenced Olsen to death. *Id.* at ¶ 56, 67 P.3d at 559.

[¶ 37] On appeal, Olsen argued that his "counsel conceded his guilt without pursuing the affirmative defense [of not guilty by reason of mental illness or deficiency]." *Id.* at ¶ 70, 67 P.3d at 564. After resolving that issue,[18] we further stated:

Our independent review requires that we examine whether trial counsel's admission of guilt to the shootings violates the rule that "the admission by counsel of his client's guilt to the jury[ ] represents a paradigmatic example of the sort of breakdown in the adversarial process that triggers a presumption of prejudice." *United States v. Williamson,* 53 F.3d 1500, 1511 (10th Cir.1995). Wyoming recognizes that there are cases of deficient performances where prejudice is presumed. *Herdt v. State,* 816 P.2d 1299, 1301–02 (Wyo. 1991). . . .

. . .

The Eighth Circuit has considered similar facts and concluded that admitting the act but denying the requisite mental state

by an intoxication defense to first degree murder charges is not the functional equivalent of a guilty plea. *Nielsen v. Hopkins,* 58 F.3d 1331, 1335 (8th Cir.1995); *Parker v. Lockhart,* 907 F.2d 859, 861 (8th Cir. 1990). We agree with that analysis and find that the concession here was, tactically, a reasonable attempt to avoid a first degree murder conviction in light of Olsen's several confessions that he had shot the victims. We find no error.

*Olsen,* 2003 WY 46, ¶¶ 75–76, 67 P.3d at 565–66.

■ [¶ 38] We find that the circumstances in the instant case are quite similar to the circumstances in *Olsen.* "Whether such an admission [of guilt] actually occurred is necessarily fact-intensive." *United States v. Williamson,* 53 F.3d 1500, 1511 (10th Cir.), *cert. denied,* 516 U.S. 882, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995). In the instant case, the appellant was charged with first-degree premeditated murder and entered a "not guilty" plea to that charge. The evidence that the appellant stabbed and killed the victim was overwhelming: (1) Cunningham witnessed the stabbing; (2) the appellant stated to Lacquement that the appellant "might be going down this time" and believed the victim had been "stabbed or killed"; (3) the appellant confessed to Richards multiple times that he killed the victim and also stated that he "stabbed" her "in the heart"; (4) the appellant confessed to his father that he killed the victim; (5) the appellant confessed to Detective Elliott in a tape-recorded statement that he stabbed the victim, left the knife in his kitchen sink, and verified that the victim was dead-the appellant further stated that Cunningham did not participate in the stabbing; and (6) the victim's blood was identified on the appellant's right hand, and on the knife found in the appellant's kitchen sink. The appellant acknowledges that "[t]here can be no question that this was a difficult case" for his trial counsel.

---

18. In the context of this particular issue, we noted that because "neither the record nor this appeal suggest otherwise, we assume that Olsen consented to a trial strategy of admitting during voir dire to shooting the victims either to avoid the death penalty through convictions for second degree murder or to reduce culpability in the sentencing phase." *Olsen,* 2003 WY 46, ¶ 71, 67 P.3d at 564.

[¶ 39] It is apparent from the record that, facing this evidence, the appellant's trial counsel sought to avoid a first-degree murder conviction by admitting that the appellant stabbed and killed the victim, undermining the requisite mental state for first-degree murder due to the appellant's intoxication,[19] and asking the jury for a verdict of manslaughter based on the circumstances surrounding the stabbing. We concluded in *Olsen* that a nearly identical approach was "not the functional equivalent of a guilty plea" and that it was, tactically, "a reasonable attempt to avoid a first degree murder conviction in light of Olsen's several confessions that he had shot the victims." [20] *Olsen*, 2003 WY 46, ¶ 76, 67 P.3d at 566. *See generally also, for example, Trice v. Ward*, 196 F.3d 1151, 1161–62 (10th Cir.1999), *cert. denied*, 531 U.S. 835, 121 S.Ct. 93, 148 L.Ed.2d 53 (2000); *United States v. Johnson–Wilder*, 29 F.3d 1100, 1105 (7th Cir.1994); and *State v. Williams*, 797 So.2d 1235, 1239–41 (Fla.2001). "The fact that [the appellant's] theory was ultimately unsuccessful does not require a holding that he did not receive effective assistance of counsel." *Bloomquist v. State*, 914 P.2d 812, 822 (Wyo.1996).

[¶ 40] We add that the instant case is not the kind envisioned by *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), wherein the appellant's trial counsel completely or entirely failed to subject the prosecution's case to meaningful adversarial testing. In fact, trial counsel in the instant case:

1. Filed several pretrial motions and succeeded in excluding some potentially damaging testimony.

2. Presented an opening statement, during which statement counsel emphasized the evidence he expected would tell the "rest of the story" (as opposed to the prosecution's version), including the severity of the appellant's drinking problem, the nature of the relationship between the appellant and the victim, the appellant's drinking leading up to the stabbing, and the circumstances surrounding the stabbing.

3. Made numerous trial objections.

4. Cross-examined most of the trial witnesses, and cross-examined Cunningham extensively regarding his intoxication level during the relevant time period, how much alcohol the appellant had consumed and his resulting level of intoxication, a potential inconsistent prior statement to law enforcement, and a potential contradiction between Cunningham's testimony and that of a bartender as to Cunningham's demeanor August 16.

5. Made a motion for a judgment of acquittal.

6. Presented a closing argument, during which argument counsel recited the presumption of innocence and the applicable burden of proof, referenced the second-degree murder and manslaughter jury instructions, attacked the manner in which the prosecution presented its case (equating it to a "bad movie" that the prosecution attempted to overcome by presenting its case so that it would be more appealing to the jury), emphasized the appellant's extensive alcohol consumption in general and on the night in

---

19. The jury was instructed that if they found that the defendant, at the time of the offense was suffering from self-induced intoxication to such a degree that there is a reasonable doubt in your minds whether the defendant possessed the mental ability to form premeditated malice necessary for First Degree Murder, then you should find the defendant not guilty of the crime of First Degree Murder.

20. The appellant attempts to distinguish *Olsen* and the legal authority cited therein because the appellant "did not make multiple confessions," he made "one confession to law enforcement, while most likely still highly intoxicated," and Cunningham "was a long-term alcoholic who was intoxicated, and whose story did not even match the details of" the appellant's confession. The appellant also emphasizes that the instant case is not one in which the appellant actually testified at trial and admitted that he stabbed the victim. However: (1) the record reveals that in addition to Cunningham's eyewitness testimony regarding the stabbing, the appellant confessed that he stabbed and/or killed the victim to his father, to two friends, and to law enforcement; (2) we note that Cunningham's testimony was also consistent with the appellant's statement to law enforcement in many ways, and nothing in the record undermines the reliability of his testimony that the appellant stabbed and killed the victim; and (3) Olsen did not testify at his trial (*Olsen*, 2003 WY 46, ¶ 16, 67 P.3d at 550).

question, emphasized Cunningham's demeanor and extensive drinking on the night in question, emphasized the victim's intoxicated state, and concluded with a detailed argument (including the appellant's mental state at the time of the stabbing) as to why the circumstances surrounding the stabbing did not support "premeditation" as opposed to "heat of passion."

[¶ 41] The district court characterized the appellant's trial defense as "competent and emphatic." *See generally Turrentine v. Mullin*, 390 F.3d 1181, 1207–08 (10th Cir. 2004) and *Cooks v. Ward*, 165 F.3d 1283, 1293–96 (10th Cir.1998), *cert. denied*, 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999).

[¶ 42] The appellant does not further analyze this issue pursuant to the *Strickland* standard. *See Sincock*, 2003 WY 115, ¶¶ 39, 57–59, 76 P.3d at 337, 341–42.

### *Jury Instructions*

[¶ 43] The appellant argues that the district court failed properly to instruct the jury on the premeditation element of first-degree murder. According to the appellant, the jury instructions given to the jury in the instant case were "misleading, incomplete, inadequate and confusing" because the

> "premeditation" instruction . . . emphasized that premeditation implies an interval, however brief, between the formation of the intent or design to kill and the commission of the act which results in death, but did not inform the jury that [the appellant] also had to have **deliberated** upon the intent or design to kill, which cannot happen in "an interval, however brief."

(Emphasis in original.) The appellant claims the jury instructions in the instant case "do not explain that a person can have the intent to kill, but **not** have the rational and reflective intent to commit premeditated murder"—"the decision to kill must be made after careful thought and deliberation and it

cannot be a 'rash impulse.'" (Emphasis in original.) The appellant cites to a California pattern jury instruction quoted from a California case,[21] Black's Law Dictionary definitions of "deliberate," a Tennessee case, and an Arizona case as examples of how a jury should be instructed. He concludes that

> [s]o long as this Court continues to adhere to the notion that "premeditation" "implies an interval, however brief, between the formation of the intent or design to kill and the commission of the act which results in death," a notion not specified by the Wyoming Legislature, without any regard to "deliberation," state prosecutors will continue to charge an otherwise second degree murder case, or manslaughter, as first degree murder, and juries will continue to render guilty verdicts for first degree murder, even as common sense tells oneself that such cases are not what the Wyoming Legislature intended as first degree homicide.

### Standard of Review

[¶ 44] "It is . . . well established that a trial court has a duty to instruct a jury on the general principles of law applicable to the case at issue. A trial court is given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found. Instructions must be considered as a whole, and individual instructions, or parts of them, should not be singled out and considered in isolation. *Ogden v. State*, 2001 WY 109, ¶ 8, 34 P.3d 271, ¶ 8 (Wyo.2001); *Coburn v. State*, 2001 WY 30, ¶ 9, 20 P.3d 518, ¶ 9 (Wyo.2001); *Merchant v. State*, 4 P.3d 184, 190 (Wyo. 2000).

Jury instructions shall not be ruled defective absent a showing that the instructions confused or misled the jury as to the proper principles of law and prejudiced the defendant. *Lane v. State*, 12 P.3d 1057,

---

21. The appellant argues that we should "adopt the definitions and jury instructions used in conjunction with" this California authority because the *Bouvkamp v. State*, 833 P.2d 486, 494–95 (Wyo.1992) decision quotes from *People v. Crandell*, 46 Cal.3d 833, 251 Cal.Rptr. 227, 760 P.2d

423, 441 (1988), *cert. denied*, 490 U.S. 1037, 109 S.Ct. 1936, 104 L.Ed.2d 408 (1989) for the proposition that the killing must be the result of "'a preexisting reflection'" after "'careful thought and weighing of considerations. . . .'"

1061 (Wyo.2000). Prejudicial error must be demonstrated, and prejudice will not be demonstrated unless the instruction confused or misled the jury with respect to the proper principles of law. *Wilson v. State,* 14 P.3d 912, 916 (Wyo.2000). Further, a failure to instruct properly on an element of a crime does not constitute plain error where evidence of the defendant's guilt is overwhelming. *Id.*"

*Adams v. State,* 2003 WY 152, ¶ 4, 79 P.3d 526, 529–30 (Wyo.2003) (*quoting Black v. State,* 2002 WY 72, ¶¶ 4–7, 46 P.3d 298, 300 (Wyo.2002)).

[¶ 45] The appellant did not object to the jury instructions relevant to this issue at trial, nor did the appellant propose any alternative jury instructions to the district court consistent with his appellate argument on this issue. We therefore apply the plain error standard of review:

"First, the record must clearly present the incident alleged to be error. Second, appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way. Last, the appellant must prove that he was denied a substantial right resulting in material prejudice to him."

*Ogden v. State,* 2001 WY 109, ¶ 9, 34 P.3d 271, 274 (Wyo.2001) (*quoting In Interest of CB,* 749 P.2d 267, 268–69 (Wyo.1988)).

**Discussion**

[¶ 46] The district court instructed the jury in the instant case on the elements of first-degree murder, second-degree murder, and manslaughter. The appellant's contentions concern the substantive jury instructions on first-degree murder. Wyo. Stat. Ann. § 6–2–101(a) provides, in pertinent part, that whoever "purposely and with premeditated malice ... kills any human being is guilty of murder in the first degree." The jury instructions given on first-degree murder in the instant case provided, in pertinent part:

22. Clearly, the definition of "malice" does not take into account our discussion of the term in *Keats v. State,* 2003 WY 19, ¶¶ 16–33, 64 P.3d

INSTRUCTION NO. *11*

The elements of the crime of Murder in the First Degree, as charged in this case, are:

1. On or about the 17th day of August, 2002;
2. In Sweetwater County, Wyoming;
3. The Defendant, [the appellant];
4. Purposely; and
5. With premeditated malice;
6. Killed [the victim].

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

INSTRUCTION NO. *12*

"Premeditated malice" means that the Defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse.

"Premeditated" implies an interval, however brief, between the formation of the intent or design to kill and the commission of the act which results in death.

"Purposely" means intentionally.

"Malice" means the state of mind in which an intentional act is done without legal justification or excuse. The term "malice" conveys the meaning of hatred, ill will, or hostility toward another.

These instructions mirror W.Cr.P.J.I. §§ 21.01A, 21.01B, 21.01C, and 21.01D (2004).[22]

[¶ 47] We recently considered a nearly identical argument in *Pena v. State,* 2004 WY 115, ¶¶ 41–44, 98 P.3d 857, 873–74 (Wyo. 2004):

104, 109–114 (Wyo.2003), which was published only two months before the trial in this case, but no issue has been raised in that regard.

Pena argues that the instructions as given could allow a jury to find a defendant guilty of first degree murder simply because the defendant had the intent to kill. Pena argues the instructions did not inform the jury that a person could have the intent to kill but still not be guilty of first degree murder because he did not have the required rational and reflective thought necessary for premeditation. If the jury instructions had adequately defined premeditation, Pena continues, then there is the possibility that the jury would have found that the State had not carried its burden of proving premeditation beyond a reasonable doubt.

The jury instructions, however, were taken directly from the Wyoming Criminal Pattern Jury Instructions. Pena did not object to the jury instructions at trial. The jury was instructed " 'premeditated malice' means that the defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse." We are unsure from the argument presented in Pena's opening brief if Pena is ignoring the jury instruction requirement that the defendant "thought about and considered the idea of killing before the act" or if Pena simply concludes that the phrase "thought about and considered" is not sufficient to adequately inform the jury that something beyond mere intent to kill is a necessary prerequisite to a finding of first-degree murder. Pena only argues that the jury instructions failed to instruct the jury that it had to find something beyond the intent to kill to find first degree murder.

In another sufficiency of the evidence case, *Collins v. State,* 589 P.2d 1283 (Wyo. 1979), this Court stated that:

"The defendant's argument is better designed for jury consumption than an appellate court's. A failure on the part of the State to prove malice and premeditation are principally urged by defendant. Malice can be presumed from use of a firearm. *Goodman v. State,* Wyo.1977, 573 P.2d 400, 414. The word 'premeditated' when used in reference to first-

degree murder, implies an interval, however brief, between the formation of the intent or design and the commission of the act. *State v. Riggle,* 1956, 76 Wyo. 1, 298 P.2d 349, reh. den. 76 Wyo. at 63, 300 P.2d 567, cert.den. 352 U.S. 981, 77 S.Ct. 384, 1 L.Ed.2d 366; *Loy v. State,* 1919, 26 Wyo. 381, 185 P. 796."

*Collins,* at 1292. The pattern jury instructions reflect the decision in *Collins.* This is still the law in Wyoming:

"In *Bouwkamp,* 833 P.2d at 493, we reiterated the meaning of premeditation:

'It [premeditation] is the "thinking over, deliberating upon, weighing in the mind beforehand, resulting in a deliberate intention to kill which constitutes the killing murder in the first degree." *Parker v. State,* 24 Wyo. 491, 502, 161 P. 552, 555 (1916). Premeditation may be inferred from the facts and circumstances. *Murry v. State,* 713 P.2d 202, 206 (Wyo.1986); *Goodman v. State,* 573 P.2d 400, 407 (Wyo.1977).'

Persons convicted of premeditated murder often have questioned what amount of time is required in 'thinking over' or 'deliberating upon' for juries to find that sufficient premeditation existed. Our rule is:

'Premeditation need not have existed for any given length of time before the act, it being sufficient that it existed at the time of the act; and the intent and the act may be as instantaneous as successive thoughts. *Sandoval v. People,* 117 Colo. 588, 192 P.2d 423 (1948).'

*Young v. State,* 849 P.2d 754, 761 (Wyo. 1993) (*quoting Murry v. State,* 713 P.2d 202, 207 (Wyo.1986)). *See also Rude v. State,* 851 P.2d 15, 17 (Wyo.1993); *Collins v. State,* 589 P.2d 1283, 1292 (Wyo. 1979)."

*Hightower v. State,* 901 P.2d 397, 403 (Wyo.1995). We think the jury instruction adequately conveys the definition of premeditation under Wyoming law.

Besides a suggestion that Wyoming should adopt California jury instructions,

Pena presents no cogent argument and cites to no pertinent authority that we should change the law of premeditation in Wyoming. The jury was adequately instructed on the meaning of the definition of premeditation as it currently exists under Wyoming law, and there was sufficient evidence to support a conviction of first degree murder.

(Footnote omitted.)

[¶ 48] Pena apparently argued in his reply brief that "Wyoming's law of premeditation is incorrect and should be clarified." *Pena*, 2004 WY 115, ¶ 44 n. 6, 98 P.3d at 874 n. 6. We responded as follows:

In his reply brief he presents the argument in a direct attack of the jury instructions under the plain error standard. Pena did not frame a challenge to the jury instructions in his opening brief. A reply brief is not the place for an appellant to present new issues. It certainly is not the place to raise a new issue of constitutional magnitude. Even if this Court were to address the issue, there would be no need for this Court to make a definitive decision regarding the exact definition of premeditation. The evidence in this case supports any definition that the defense might argue. Pena retrieved his rifle and loaded it telling his wife he was going to kill her. He then carried the rifle around with him for at least a half hour as he continued a heated argument with his wife. It can reasonably be inferred that Pena had plenty of time to premeditate, deliberate or otherwise think about and consider killing his wife. The portion of the reply brief presenting argument on the definition of premeditation is stricken as being violative of W.R.A.P. 7.03.

*Id.*

[¶ 49] In the instant case, the appellant similarly appears to ignore the fact that the jury was instructed in Instruction No. 12 that the appellant was required to have *"thought about and considered the idea of killing*

*before the act which caused death was committed,"* that the act which caused death was done with intent to kill and without legal justification or excuse, and that premeditation implies an interval, however brief, between the formation of the intent or design to kill and the commission of the act which results in death. (Emphasis added.) As we said in *Pena*, this was a correct statement of existing law in Wyoming. *Pena*, 2004 WY 115, ¶ 43, 98 P.3d at 874. *See also Duke*, 2004 WY 120, ¶ 77, 99 P.3d at 951. Nor has the appellant sufficiently articulated how the evidence in the instant case, when viewed according to the jury instructions given, was susceptible to the kind of jury confusion alleged by the appellant. Accordingly, the appellant has not established that a clear and unequivocal rule of law was violated in a clear and obvious, and not merely arguable, way and has not demonstrated the requisite prejudice.[23]

### *Failure to Appoint Substitute Counsel*

[¶ 50] The appellant claims that the district court abused its discretion by denying the appellant's pretrial request for substitute counsel. The appellant sent a letter to the district court dated February 14, 2003. In the letter, the appellant requested a change in counsel for several reasons. The district court held a hearing on March 6, 2003, during which hearing the appellant presented his concerns and trial counsel responded to the concerns. The district court characterized the difficulties between the appellant and counsel as a "deterioration in communication," denied the appellant's request, and ordered the appellant to communicate "with [his] attorneys in a reasonable fashion." The district court noted that it was evident from the court file that counsel had "worked on [the appellant's] case, but they need to talk to you and you need to talk with them, and you also need to listen to them." Having carefully reviewed the record and the applicable legal standard found in *Allen v. State*, 2002 WY 48, ¶¶ 27, 30, 43 P.3d 551,

---

23. As an extension of this argument, the appellant also merely asserts that the evidence at trial was insufficient to prove that the appellant deliberated prior to stabbing the victim and in a one-sentence argument that if the burden was on the appellant to object to, or propose alternative, jury instructions, the appellant's trial counsel "was ineffective...." These conclusory statements can hardly be deemed cogent argument.

560–61 (Wyo.), *cert. denied*, 537 U.S. 899, 123 S.Ct. 201, 154 L.Ed.2d 170 (2002), we cannot say that the district court abused its discretion in denying the appellant's request for substitute counsel at that time.

[¶ 51]   Affirmed.